NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 11-184

PAUL CHERAMIE

VERSUS

RICHARD E. NOREM, II, M.D.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 235,970
HONORABLE GEORGE CLARENCE METOYER JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

BILLY HOWARD EZELL
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

AFFIRMED.

Eugene Joseph Sues
Sarah Spruill Couvillion
Gold, Weems, Bruser, Sues
P. O. Box 6118
Alexandria, LA 71307-6118
(318) 445-6471
Counsel for Defendant/Appellee:

Richard E. Norem, II, M.D.
Dan Boudreaux
Keith R. Giardina Law Offices
9100 Bluebonnet, Suite 300
Baton Rouge, LA 70809
(225) 293-7272
Counsel for Intervenor/Appellee:
Liberty Mutual Insurance Company

**Eugene A. Ledet, Jr.**
**Joseph T. Dalrymple**
**Dalrymple & Ledet**
**P. O. Drawer 14440**
**Alexandria, LA 71315**
**(318) 442-1818**
**Counsel for Plaintiff/Appellant:**
**Paul Cheramie**

**EZELL, Judge.**

In this medical malpractice case, Paul Cheramie appeals a jury verdict finding Dr. Richard Norem did not breach the standard of care in his post-surgical treatment of him. For the following reasons, we affirm.

## FACTS

While attempting to lift a heavy object at work, Mr. Cheramie suffered a hernia. Mr. Cheramie sought treatment from Dr. Norem. On January 26, 2005, Dr. Norem performed a hernia repair on Mr. Cheramie at Rapides Regional Medical Center. Mr. Cheramie was discharged on January 29, 2005.

On February 1, Mr. Cheramie returned to the emergency room because he had no appetite, had drainage from the left lower port site, and was running fever. Dr. Norem suspected peritonitis and performed an exploratory laparotomy procedure. A hole in the small intestine was discovered and repaired. Due to the peritonitis and infection, mesh could not be used again on the thin abdominal wall, so Dr. Norem used five to six Ethibond retention sutures, which are permanent sutures. Following this surgical procedure, Mr. Cheramie was released from the hospital on February 16, 2005.

Dr. Norem continued monitoring Mr. Cheramie in his office. Our factual recitation will include the pertinent visits during the next twenty-seven months. Mr. Cheramie argues on appeal that the jury should have found that the care rendered by Dr. Norem during this time period was substandard.

Initially, it appeared that Mr. Cheramie was healing well. Subsequently, Dr. Norem began to observe the development of granulation tissue on Mr. Cheramie's abdomen. Granulation tissue is a healing tissue. Dr. Norem began applying silver nitrate to the granulation tissue. On June 14, 2005, Dr. Norem used a hemostat to probe down into one of the areas of the hypergranulation, an area where the healing tissue is rising above the top of the skin. He was able to grab one of the retention

sutures, snip it, and remove it. Dr. Norem continued using silver nitrate on the granulation tissue and applying Bactroban antibiotic ointment.

Dr. Norem testified that this was the first indication he had that Mr. Cheramie was developing suture granulomas. A suture granuloma develops when a patient begins to reject the retention sutures, which try to work their way out of the body, creating a nodule which leads to drainage coming out of the skin. Testimony also referred to these areas as sinuses, areas where infectious material works its way to the surface and causes an erosion of the skin. As described by Dr. Norem, a sinus is "like a hole on one end and a blind closure on the other side."

On July 5, 2005, there were three small areas with the hypergranulation tissue on Mr. Cheramie's abdomen. Dr. Norem probed them with a hemostat but could find nothing. Dr. Norem was suspicious that Mr. Cheramie was going to have more suture granulomas. At the August 29, 2005 visit, Mr. Cheramie had five small openings on his abdomen, so Dr. Norem checked them with the hemostat and was able to recover two more of the retention sutures.

By the October 3, 2005 visit, three of the spots had completely healed, so there were only two open areas left at that time. One spot was near the navel, and the other spot was located toward the top of Mr. Cheramie's abdomen. Dr. Norem could not find any sutures in the two spots at this visit. The next day, Mr. Cheramie called Dr. Norem's office complaining of severe abdominal pain with a clear, bloody drainage. Dr. Norem wrote a prescription for Levaquin, an antibiotic, and Lortab for pain. On the October 10, 2005 visit, Dr. Norem told Mr. Cheramie that he was doing okay and that he should continue to wait for the last two sutures to come out.

At the February 14, 2006 visit, Mr. Cheramie reported that he felt a string come out of the lower wound. Dr. Norem was not certain that it was a piece of suture, but observed that the lower area was almost completely healed. On the March 28, 2006 visit, Mr. Cheramie reported not feeling well and had recorded

2

a fever of 101 degrees. Dr. Norem noted that both of the sinuses were open but there was no drainage. Dr. Norem prescribed Septra DS for Mr. Cheramie and ordered a CAT scan. The CAT scan indicated that there was no evidence of intra-abdominal abscesses or signs of infection.

On June 2, 2006, Dr. Norem presented Mr. Cheramie with the option of having surgery to remove the sutures or continuing with the current conservative management treatment until Dr. Norem could retrieve the sutures. Mr. Cheramie opted to continue with conservative treatment.

On September 7, 2006, another CAT scan was performed because Mr. Cheramie had called complaining of abdominal pain and episodes of sweats. Dr. Norem also prescribed Levaquin and Lortab. On September 13, they discussed the results of the CAT scan, which indicated that Mr. Cheramie had a small gallstone. Dr. Norem testified that they discussed the option of removing the sutures if Mr. Cheramie had surgery to remove the gallbladder. Mr. Cheramie indicated that he would consider it.

On January 8, 2007, Dr. Norem noted that the upper opening had a tiny bit of pus and the opening near the navel had reopened after it appeared almost completely healed by November 10, 2006.

On March 26, 2007, Mr. Cheramie came in because he had an area of redness rise on his abdomen in the left upper portion. Dr. Norem's exam revealed a fluid-filled sac, so he drew off some fluid from it. Dr. Norem suspected that Mr. Cheramie was developing an abscess. He again placed Mr. Cheramie on Levaquin. Dr. Norem also sent the fluid off for a culture and sensitivity, but the laboratory performed a different, unintended test on it instead. By April 4, 2007, the area had resolved. He still had the two sinuses, but there was not any new drainage.

By May 2, 2007, the area had accumulated a smaller amount of fluid. Dr. Norem again withdrew the fluid and sent it off for culture. He also once more

prescribed Levaquin. The culture revealed staphylococcal aureus which was Methicillin-resistant and also showed a gram-positive rod called carinni bacterium which is a normal skin-inhabiting species. Both were light growth. Mr. Cheramie never returned to see Dr. Norem after this visit.

On May 16, 2007, Dr. Norem received a written request from Liberty Mutual Insurance Company, the workers' compensation insurer for Mr. Cheramie's employer, requesting a second opinion. Dr. Norem responded on May 17 granting the order.

On May 27, 2007, Mr. Cheramie was examined by Dr. Kerry Thibodeaux, an expert in general surgery with a subspecialty in wound care. Dr. Thibodeaux observed the multiple sinus holes with pus draining from them, as well as cellulitis, a reddening of the skin, with warmth, tenderness, and swelling. Dr. Thibodeaux noted that Mr. Cheramie did not show any signs of toxicity.

On May 29, Dr. Thibodeaux performed surgery on Mr. Cheramie to remove the remaining retention sutures. Mr. Cheramie's problems resolved within a few weeks following this surgery.

Mr. Cheramie filed a complaint against Dr. Norem with the Louisiana Patient's Compensation Fund. In an opinion rendered on June 29, 2009, the medical review panel reached the following unanimous opinion:

> Dr. Norem performed a difficult surgical procedure in the proper fashion with the proper patient consent. Dr. Norem documented that he had a discussion with the patient about alternative care, and the evidence indicates that the patient was satisfied with the course of treatment provided by Dr. Norem. The conservative management that was performed was not an unreasonable or improper choice.
>
> An enterotomy was performed and taken care of appropriately. Followup [sic] with Dr. Norem occurred over the course of approximately 30 visits, and the patient showed slow improvement. The slow healing was not unusual or unexpected. The patient did appear on the way to healing when he saw another doctor, and while that doctor may have had a fresh look at things, it did not mean that Dr. Norem breached the applicable standard of care in

4

his treatment of the patient.  The evidence does not support that there was any substandard care by Dr. Norem.

On August 17, 2009, Mr. Cheramie filed the present medical malpractice action alleging Dr. Norem deviated from the standard of care in perforating the small bowel during the procedure on January 29, 2005; in failing to recognize the bowel had been perforated; failing to recognize and allowing foreign objects from January 29, 2005 through May 2, 2007; in failing to perform exploratory surgery to determine the reason the wound would not heal; in failing to culture the wound from January 29, 2007 through May 2, 2007; in inappropriately prescribing Levaquin for an infection and continuing the prescription well beyond the recommended period; and in failing to fully inform Mr. Cheramie of surgical versus conservative treatment of his wound.

A jury trial was held on July 20, 2010 through July 23, 2010.  The jury found that Dr. Norem's actions in his treatment of Mr. Cheramie did not fall below the standard of care.  Mr. Cheramie filed a motion for a judgment notwithstanding the verdict, which was denied by the trial court.  Mr. Cheramie then filed the present appeal.

On appeal, Mr. Cheramie argues that the jury committed error in finding that Dr. Norem did not breach the standard of care in his post-surgical treatment.  Mr. Cheramie argues on appeal that the jury erred in finding that Dr. Norem timely advised him of his options for removal of the infected sutures and, when Dr. Norem finally advised him of the option to surgically remove the sutures, the information was insufficient for him to make an informed decision concerning his treatment.

## INFORMED CONSENT

Mr. Cheramie alleges that he was not fully informed of his options during the course of his treatment.  He asserts that he should have been told that if he chose conservative management, as opposed to surgical removal of the infected sutures, he could suffer with chronic infection and drainage for years to come.  Mr. Cheramie

5

also alleges that Dr. Norem's explanation of a "life-ending situation" if the sutures were surgically removed was not an accurate assessment of the risks. Finally, Mr. Cheramie alleges that Dr. Norem's refusal to allow a second opinion with a wound care specialist restricted his right to be fully informed of his condition and options.

Louisiana Revised Statutes 40:1299.40 governs the consent that must be obtained from a patient in order to proceed with medical treatment.

> The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.

*Hondroulis v. Schuhmacher*, 553 So.2d 398, 411 (La.1988)(citations omitted). *Also see Pertuit v. Tenant Louisiana Health Sys.*, 10-654-56 (La.App. 4 Cir. 9/22/10), 49 So.3d 932.

**Treatment Options**

After his surgery to repair the hole in the intestine and clean out the abdominal area, Mr. Cheramie began to heal as expected. However, on June 14, 2005, Dr. Norem examined an area of hypergranulation and was able to remove one of the permanent sutures he had used. This was the first indication that Mr. Cheramie was rejecting the permanent sutures. All doctors who testified agreed that a low percentage of patients will reject permanent sutures. They also agreed that it is appropriate protocol to follow the patient to see if the remaining sutures would also extrude on their own.

With one suture removed, this left four to five more sutures to be rejected. Two more were removed in August 2005, and Mr. Cheramie may have later recovered a suture at home. Dr. Norem continued to follow Mr. Cheramie and monitor the sinus areas on his abdomen which indicated he was rejecting the sutures. On June 2, 2006, Dr. Norem talked to Mr. Cheramie about continuing conservative treatment and also, for the first time, informed Mr. Cheramie that surgical removal of the sutures was a possibility. Dr. Norem was concerned because Mr. Cheramie was getting a slight increase in drainage. Dr. Norem testified that Mr. Cheramie wanted to continue with conservative treatment.

Mr. Cheramie testified that he opted not to have surgery because Dr. Norem told him that any surgery would probably end his life. He did not want to have surgery if he was going to die. Linda Saffel, the workers' compensation case manager, testified that Dr. Norem thought that additional surgery was not indicated because it could result in a "life-ending" situation. She also testified that Dr. Norem thought that Mr. Cheramie might have chronic drainage indefinitely. Buddy Hudspeth was asked to perform a vocational assessment of Mr. Cheramie. Mr. Hudspeth also testified that Dr. Norem indicated that more abdominal surgery could result in a life-ending situation for Mr. Cheramie. Dr. Norem testified that he does not use the term "life-ending" but will use the term "life-threatening." He testified that the actual surgery to remove the sutures was not life threatening but that the complications that could occur were life threatening.

Dr. Thibodeaux, who removed the remaining sutures, agreed that it is perfectly acceptable to let the sutures extrude on their own. However, he further explained that the need for repeated treatment with antibiotic therapy would warrant a more aggressive approach and removal of the sutures. Dr. Thibodeaux stated that when signs of infection showed, Dr. Norem placed Mr. Cheramie on antibiotic therapy. There was a history of recurrent infections that had to be the result of the retained

7

sutures. Dr. Thibodeaux stated that an identification of a retained foreign body as the cause of a recurrent infection indicates that every effort must be made to remove it. Dr. Thibodeaux testified that with the first or second recurrence of infection, it would have been preferable to remove the sutures and shorten the course of treatment. Dr. Thibodeaux did admit that there is no literature that indicates that surgery should be performed in a set period of time. However, he also stated that there is no literature that justifies waiting thirty months.

Dr. Thibodeaux testified that there was minimal risk in performing the surgery because the sutures were in the abdominal wall. After Mr. Cheramie had surgery, his problems resolved within a few weeks.

Dr. Ronald Nichols, an expert in general surgery now teaching at Tulane University, testified that there was no set time to operate. Dr. Nichols stated that Mr. Cheramie did not have an infection until May or June 2007 and this is when surgery became a possibility. Dr. Nichols based his opinion on the fact that this is when there was an accumulation of pus for the first time. Dr. Norem's own notes reveal that there was a bit of pus in January 2007. Also, in October 2005, there was a bloody discharge, and Dr. Norem prescribed Levaquin, an antibiotic, for the first time. Dr. Norem admitted that there was a "localized nidus of infection or a pinpoint area at the suture" during the entire twenty-seven months that he took care of Mr. Cheramie's suture sinuses. However, Dr. Nichols testified that he did not see any evidence that Mr. Cheramie was seriously infected. He further explained that someone can do their everyday business with the presence of a suture granuloma. Dr. Nichols stated that, unfortunately, suture granulomas can go on for a long period of time. Dr. Nichols told the jury that Dr. Norem did not breach the standard of care in any aspect of the case.

Dr. James Bordelon, a general surgeon who served on the medical review panel, testified that conservative management was not an unreasonable or improper choice. He explained that Mr. Cheramie's condition was never life threatening and that

8

surgery to remove the sutures would have been elective. He agreed that these sutures were infected when Mr. Cheramie began rejecting them. Dr. Bordelon stated that the situation would fluctuate. Dr. Bordelon also told the jury that if the suture could be found easily, then no risk would arise. However, if dissection through the abdominal wall layers was required, then there is a risk of injuring the underlying structures. He further testified that he would have told the patient that there is a risk in going in and pulling out the sutures but it is a slight risk. He also explained that prescribing antibiotics during the process was a concern for the possibility of future infection.

Dr. Bordelon agreed that Mr. Cheramie should have been told that there was an alternative to cure his problem other than just sitting by and waiting. However, he further agreed that Dr. Norem met appropriate informed consent standards.

We agree with Mr. Cheramie that Dr. Norem was late in informing him of his option to have surgery. Also, it appears that when he finally did, Dr. Norem may have exaggerated the risk involved in the surgery, basically taking away any option of surgery in Mr. Cheramie's mind. However, the jury did have evidence that it was appropriate for Dr. Norem to follow Mr. Cheramie conservatively and that he acted within proper standards of informing Mr. Cheramie of his options for surgery.

"When there are conflicting expert opinions concerning compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier to fact." *Price v. Erbe USA, Inc.*, 09-1076, p. 15 (La.App. 3 Cir. 6/9/10), 42 So.3d 985, 996, *writ denied*, 10-1628 (La. 10/8/10), 46 So.3d 1271. We find no error in the jury's finding that Mr. Cheramie had been properly informed of his treatment options.

**Second Opinion**

Mr. Cheramie also complains that Dr. Norem's refusal to allow a second opinion with a wound care specialist restricted his rights to be fully informed of his condition, as well as his options for treatment.

9

Ms. Saffel, who monitored Mr. Cheramie's case for about two-and-a-half years, testified that she inquired of Dr. Norem in August 2006 about Mr. Cheramie seeing a wound care specialist since the open area continued to drain. Ms. Saffel stated that Dr. Norem told her that the wound was just under the surface and the worst thing to do was have another doctor go in and dig around because it could open a source of infection. Ms. Saffel stated that she spoke to Dr. Norem several times about Mr. Cheramie seeing a wound care specialist and he told her absolutely not. Ms. Saffel's notes indicated that Mr. Cheramie wanted to see a wound care specialist in May 2007. Mr. Cheramie's testimony confirmed Ms. Saffel's testimony. Dr. Norem testified that if Ms. Saffel had requested a second opinion, he would have granted it.

Another case manager took over the case after that. On May 16, 2007, Dr. Norem received a letter from the workers' compensation insurer requesting a second opinion, which Dr. Norem granted. Ms. Saffel admitted that it was standard procedure for the workers' compensation insurer to request a second opinion by letter. This is when Mr. Cheramie went to see Dr. Thibodeaux.

Obviously, the jury had conflicting testimony about when Dr. Norem received a request to allow Mr. Cheramie to see a wound care specialist. However, upon written request, Dr. Norem agreed to a second opinion immediately. We find no error in the jury's finding that Dr. Norem did not breach the standard of care in approving a second opinion at the time he did for Mr. Cheramie.

For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Paul Cheramie.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules-Courts of Appeal. Rule 2-16.3.