PITMAN, J.
[, This is a medical malpractice/wrongful death action brought by Plaintiffs William McDougald, Joey McDonald and Tracy McDonald, the husband and two adult sons, respectively, of Darlene McDougald (who died of a heart attack after she temporarily discontinued taking her prescribed blood thinner, Plavix, and aspirin, for a seven-day period prior to arthroscopic surgery on her knee) against Defendants St. Francis North Hospital, Inc., Dr. Mack Temple Douglas (the emergency room physician),[1] Dr. Ronald Koepke (Ms. McDougald’s cardiologist) and Louisiana Medical Mutual Insurance Company (Dr. Koepke’s insurer).' Plaintiffs alleged malpractice based on Dr. Koepke’s failure to *1235 notify Ms. McDougald of the dangers of stopping her medication and his failure to obtain Ms. McDougald’s informed consent to cease taking the medication. The trial court determined the Louisiana Uniform Consent Law (“LUCL”), La. R.S. 40:1299.40, did not apply; therefore, no jury instruction regarding informed consent was given. A jury returned a verdict in favor of Dr. Koepke and Louisiana Medical Mutual Insurance Company and against Plaintiffs. The trial court signed a judgment in accordance with the jury’s verdict. Plaintiffs now appeal. For the following reasons, the judgment of the trial court is affirmed.

FACTS

Ms. Darlene McDougald was a 58-year-old woman with a history of heart disease who smoked cigarettes. Dr. Ronald Koepke became her cardiologist in May 2003. He prescribed daily anticoagulant medications, [ ?Plavix and aspirin, as well as other medications, for her coronary artery disease. Over the following years, Ms. McDougald had to undergo the placement of stents in her heart as her disease advanced. These surgeries are performed by an interventional cardiologist.[2] Her last stent surgery was performed in May 2007 by Dr. Greg Sampognaro.
Ms. McDougald also had recurring knee problems that became so severe and so affected her quality of life that she first considered knee surgery in 2008, but then decided against it. In 2009, she decided to proceed to have the knee surgery. Dr. Myron Bailey, an orthopaedic surgeon, sought medical clearance from Dr. Koepke before proceeding with arthroscopic surgery on Ms. McDougald’s knee.
After the request for surgical clearance was made to Dr. Koepke by Dr. Bailey, Nurse Marlene Gibson, Dr. Koepke’s head registered nurse, called Dr. Carter Cox, Ms. McDougald’s primary care physician (and the doctor who referred her to Dr. Koepke), to inquire whether Ms. MeDoug-ald was having any heart-related issues. She was informed by Dr. Cox that Ms. McDougald had not experienced any cardiac issues during the prior year.[3] Nurse Gibson then called Ms. McDougald directly to confirm that | .¡report and also discussed with her temporarily discontinuing the Plavix and aspirin.
Ms. McDougald told Nurse Gibson she was not experiencing any angina. Nurse Gibson stated that Ms. McDougald was very familiar with her medical condition and could discern between heart-related pain and other types of pain. She also stated that Ms. McDougald was knowledgeable of the purpose of Plavix. Nurse *1236 Gibson informed Ms. McDougald that it was standard procedure for a patient to discontinue the use of Plavix and aspirin anticoagulants for seven to ten days prior to surgery, in order to reduce the risk of excessive bleeding during the surgical procedure.
Nurse Gibson stated that she remembered telling Ms. McDougald that the research conducted on discontinuing Plavix was not applicable to time periods beyond one year post-stent placement. She stated that the research indicated that patients should stay on Plavix for one year until the stent was endothelialized (meaning en-dothelial tissue was formed), which reduced risks. She went on to state that there is no research upon which to base an opinion for patients who were more than one year post-stent placement. Ms. McDougald’s last stent placement surgery had been performed more than a year prior to the conversation. Nurse Gibson stamped Dr. Koepke’s signature on the clearance for the knee surgery to be performed on Ms. McDougald.
On June 26, 2009, Ms. McDougald filled out some forms in Dr. Bailey’s office in preparation for surgery. On one form, there were boxes to check if she had experienced any symptoms of certain conditions, one of those being angina. She did not mark that particular box, indicating |4that she was not experiencing chest pain.
In preparation for her knee surgery, Ms. McDougald discontinued taking the Plavix and aspirin on or about July 6, 2009. One week later, the day before her scheduled knee surgery, she developed severe chest pain and went to the emergency room of St. Francis Medical Center in Monroe, Louisiana. She suffered a myocardial infarction and died less than two hours after admission.
Ms. McDougald’s husband and two adult sons filed a medical malpractice claim with the Louisiana Division of Administration, alleging that Dr. Koepke committed medical malpractice by failing to inform Ms. McDougald of the risks associated with the cessation of Plavix and aspirin, including the possibility of death. Plaintiffs alleged that Dr. Koepke had a duty to inform Ms. McDougald of these risks pursuant to the LUCL, specifically La. R.S. 40:1299.40.[4] Plaintiffs alleged that Dr. Koepke never spoke to Ms. McDougald in 2009 and contended that, absent informed consent of a known risk of a procedure that results in harm to a patient, a prima facie case of breach of standard of care was established.
The medical review panel found that Dr. Koepke’s order to discontinue Plavix was an appropriate order since the duration of time that Ms. McDougald had been taking Plavix following the last stent placement exceeded the accepted practice guidelines for Plavix therapy of 12 months hpost-surgery. The panel further found that the standard of care did not require the doctor to discuss discontinuance of the Plavix with Ms. McDougald and that the risk of her having a stent thrombosis due to the discontinuation of the Plavix was so minimal that it was not a material risk worthy of disclosure by Dr. Koepke.
Plaintiffs sued Dr. Koepke, among others, alleging he had violated the statute requiring informed consent by failing to disclose the risks and hazards in the form required by the statute. They also alleged that Dr. Koepke had failed to disclose *1237 reasonable therapeutic alternatives (one in particular which is known as “bridging”) and failed to allow Ms. McDougald the opportunity to ask him any questions about the contemplated medical procedure, risks or alternatives. Further, they alleged Dr. Koepke failed to obtain an acknowledgment in writing, as required by the statute, that he answered such questions. Additionally, Plaintiffs alleged that Dr. Koepke’s recommendation that the Plavix and aspirin be abruptly discontinued was substandard and negligent.
On the day before trial was to begin, argument was heard concerning whether the LUCL was applicable to this case. The trial court ruled that it did not apply.
At trial, Dr. Koepke’s attorney immediately objected to Plaintiffs’ opening statement alluding to the provisions of the LUCL and the elements necessary to prove informed consent. The trial court reiterated its decision | fithat La. R.S. 40:1299.39.5 did not apply to the facts of the case.[5]
Despite this ruling, there was much testimony regarding informed consent, the content of the conversation between Ms. McDougald and Nurse Gibson and the procedures exercised by other physicians regarding surgical clearance of patients. Plaintiffs’ expert witness, Dr. Ralph Laz-zara, a cardiologist, clarified via discovery deposition that he was addressing the discontinuance of Plavix, not the process of clearing a patient for surgery or informed consent. Despite that caveat, Dr. Lazzara testified that, in his practice, he did not get written consent when advising a patient to stop taking Plavix, but merely obtained verbal consent after explaining the reasons for his advice.
Dr. David Elizardi, a cardiologist and expert witness for the defense, testified that he does not meet with patients personally to explain the risks associated with temporarily stopping Plavix or aspirin. Further, he stated that the risks of stopping the medicine for a short period of time were minuscule — specifically, there was only a 0.2 percent chance of a blockage occurring when Plavix and/or aspirin were stopped after one year following stent placement. Dr. Elizardi also stated that he had no problem with the method in which Ms. McDougald was cleared for surgery.
Dr. Robert Martin, an interventional cardiologist who sat on the medical review panel, testified in his deposition that his method of clearing patients for surgery was similar to the method used by Dr. Koepke. He also 1testified that the steps taken by Dr. Koepke were appropriate under the circumstances of this case. Dr. Martin stated that the accepted practice guideline for Plavix therapy was 12 months post-stent surgery and that the risk of Ms. McDougald having a stent thrombosis due to the discontinuation of Plavix at that time was less than one-half percent. Also in regard to the risk, Dr. Martin stated that “two years out from someone’s last procedure is too minute to discuss.”
All of the cardiologists, including Dr. Koepke, stated that many factors are considered in clearing a person for surgery, such as the patient experiencing chest pain or not having completed the 12 months’ post-stent surgery period. The presence of any other such factors would require further investigation and the possible denial of surgery. Several of the physicians *1238 testified that they did not consider Ms. McDougald to be a high-risk patient, given her stated condition at the time she requested surgical clearance.
Testimony from these physicians was that they used the same procedures and corroborated Dr. Koepke’s method for surgical clearance of a patient, i.e., having his nurse examine the patient’s chart, contacting any past consulting physicians and talking directly to the patient concerning his/her status. They further testified that, absent any factors indicating further investigation, they did not require the patient to come to their office for an examination prior to the discontinuance of the drugs and that the literature indicated that taking the drugs for one year post-stent surgery was adequate to protect the patient.
|sThe issue of informed consent arose again when jury instructions were addressed by the trial court despite its former ruling that the LUCL did not apply in this case. Plaintiffs requested a special jury instruction that this wrongful death and survival action arose from a breach of the standard of care and involved the doctrine of informed consent. Plaintiffs suggested that the statute be cited along with general principles of the application of the disclosure.
Dr. Koepke objected to the special jury instruction and contended that informed consent was not required when temporarily' stopping routine medications such as Plavix and aspirin for purposes of surgery. He argued that physicians are not required to comply with the informed consent law when undertaking such routine actions, particularly when they are in accord with medical literature. He also argued that the temporary cessation of a prescription prior to surgery is not a “medical procedure” within the context of the LUCL. Dr. Koepke argued that, even if the law should be found to apply to such routine steps taken on a daily basis, a physician is required to disclose only a material risk, and Plaintiffs bore the burden of proof on material risk.
The trial court' determined that there would be no jury instruction relative to informed consent. Plaintiffs’ attorney objected to this ruling.' The case went to the jury without a jury instruction regarding informed consent and with only the general instruction regarding Plaintiffs burden of proof that the physician either lacked the degree of knowledge or skill or failed to use reasonable care and diligence along with his best judgment in the application of that skill. The jury’s verdict form did not contain any |9questions relative to informed consent.
The jury returned the verdict on a form that asked the following question:
1) Do you find, by a preponderance of the evidence, that Dr. Koepke lacked the degree of knowledge or skill possessed by physicians licensed to practice or actively practicing in the same medical speciality as the Defendant, or that he failed to use his best judgment or the degree of care ordinarily exercised in the application of that skill?
The jury answered “No,” and the form was signed by the foreperson and dated July 18, 2013. Plaintiffs appealed.

DISCUSSION

Plaintiffs argue that the trial court erred in finding the LUCL inapplicable to the facts of this case and in refusing to include a jury instruction on the lack of informed consent.
La. R.S. 40:1299.40(A), now La. R.S. 40:1299.39.5, stated, in pertinent part, as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permis *1239 sion of a patient, through signature, marking, or affirmative action through electronic means pursuant to R.S. 40:1299.40.1, to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring sears associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
1 ipThat portion of the statute remains the same from the time of its redesignation in 2012. In 2009, when this cause of action arose, La. R.S. 40:1299.40(E)(7)(b) provided a paragraph upon which Plaintiffs relied to árgue that the case at bar was governed by the LUCL. That section, now omitted from the current statute, stated as follows:
If medical care is rendered or surgical procedure performed with respect to which the secretary has not made a determination regarding a duty of disclosure, the physician or other health care provider is under the general duty to disclose otherwise imposed by this Section.
Plaintiffs argue that the general duty encompassed by this provision when referring to “medical care” includes prescription of, and the discontinuation of, medication and imposes upon the physician a duty to disclose the risks associated with the procedure to the patient if the consequences include the enumerated risks set forth in part A of the statute. No authority, however, is cited for that proposition.
Plaintiffs further argue that Dr. Koepke admitted he did not personally communicate elements of informed consent to Ms. McDougald and claim that his failure to do so was a “material risk” under the law. They also argue that Dr. Koepke failed to communicate the additional risks Ms. McDougald faced as a result of a complicating medical condition (her longstanding history of coronary artery disease) and failed to communicate reasonable therapeutic alternatives, such as bridging.
Dr. Koepke argues that the evidence presented at trial addressed the issue of lack of informed consent, even though the trial court had already determined that the LUCL did not apply to the facts of this case. He also |n argues that the medical review panel unanimously found that he did not breach the standard of care in clearing Ms. McDougald for surgery (or the procedures used in that process) or in temporarily stopping her Plavix and aspirin.
Dr. Koepke further argues that the trial court’s decision to decline an informed consent jury instruction was harmless error, if it was error at all. He contends that Plaintiffs’ attorney was allowed to inject the issue of informed consent in his opening statement and in his closing argument. Dr. Koepke claims that Plaintiffs’ attorney was allowed to bootstrap the argument into the testimony at trial by repeatedly questioning witnesses about his alleged *1240 breach of the standard of care in not adequately explaining to Ms. McDougald the 0.2 percent risk of a late stent thrombosis due to the temporary suspension of the drugs, even though all the cardiologists who testified, including Plaintiffs’ own expert witness, found no such error in that regard. For these reasons, Dr. Koepke contends that the trial court did not err in finding that the LUCL requiring informed consent did not apply, in refusing to specially instruct the jury on informed consent or in failing to include the question on the special verdict form.

The application of La. R.S. 4.0:129940 to the facts of this case

The seminal case discussing the LUCL is Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988), in which the court found that, under the informed consent doctrine, where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the | ^general nature of proposed treatment or procedure and the risks involved therein, prospects of success, risks of failing to undergo any treatment or procedure at all and the risks of any alternative methods of treatment. The doctor has a duty to disclose to the patient all “material risks” of the proposed treatment. The risk is material when a reasonable person in what the doctor knows or should know to be the patient’s position would be likely to attach significance to the risk or to a cluster of risks in deciding whether to forego the proposed therapy.
The Hondroulis, supra, court also stated that, under the informed consent doctrine, the factors contributing significance to a medical risk are the incidence of injury and degree of harm threatened. If the harm threatened is great, the risk may be significant, even though the statistical possibility of its taking effect is very small; but, if the chance of harm is slight enough and the potential benefits of therapy or the detriments of the existing malady are great enough, the risk involved may not be significant, even though the harm threatened is very great.
For purposes of the informed consent doctrine, determination of materiality of the risk to a patient from the proposed treatment is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence through “some” expert testimony. The second step is for the trier of fact to decide whether the probability of that type of harm is a risk that a reasonable person in the patient’s position would consider in deciding on treatment. The objective standard of causation, between the physician’s failure to disclose material information concerning the proposed treatment and the material risk of damage to the patient, is | ^whether a reasonable patient in the plaintiffs position would have consented to the treatment or procedure had material information and the risks been disclosed. The physician is not required to disclose risks to a patient that are not reasonably foreseeable, are not material or are commonly understood, obvious or already known to the patient. Hondroulis, supra.
In Novak v. Texada, Miller, Masterson & Davis Clinic, 514 So.2d 524 (La.App. 3d Cir.1987), writ denied, 515 So.2d 807 (La.1987), the plaintiffs argued that the trial court erred in its failure to instruct the jury regarding informed consent when the patient’s petition complained that she had pain in her left arm and subsequent restricted movement of that arm after having been given a flu shot. The trial court found that the administration of a flu injection did not fall within the scope of La. R.S. 40:1299.40 and that the physician was not required to obtain the patient’s written consent before administering the injection. *1241 In that case, the defendant argued that administering a flu shot was a routine procedure that did not require a formal written consent. The appellate court agreed and affirmed the decision of the trial court, finding that, although the legislature provided no guidance for determining what constitutes a “medical procedure,” it found no abuse of discretion in the trial court’s conclusion that the statute did not extend to a routine flu injection. The court stated that courts will not impute meanings which lead to absurd results or extend statutes to situations the legislature never intended should be covered, citing Smith v. Town of Vinton, 209 La. 587, 25 So.2d 237 (La.1946). The court stated that to hold otherwise would lead to results in the day-to-day practice of medicine never intended by the legislature.
|uIn Daniels v. State, Through Dept, of Health & Human Resources, 532 So.2d 218 (La.App. 3d Cir.1988), the court, citing Novak, supra, held that the nonsurgical treatment of a closed wrist fracture was a routine medical procedure in which surgery was not involved and to which the informed consent statute did not apply. The court stated that, undoubtedly, the legislature did not intend to impose the requirements of the informed consent statute on physicians and medical personnel performing such a routine procedure.
In the case at bar, the clearance of a patient for surgery and the recommendation that the patient should cease taking Plavix and aspirin seven to ten days prior to surgery is a routine, nonsurgical decision made by the physician on a daily basis. It is not a “medical or surgical procedure” as contemplated in the LUCL to which the duty of informed consent applies. We note that, under the LUCL, a doctor is required to disclose all material risks to his patient. On this record, the jury was not plainly wrong to find that Ms. McDougald would not likely have attached significance to the minor risk of stopping Plavix and aspirin one week before knee surgery. We also note that Nurse Gibson did adequately discuss the issues with Ms. McDougald.
As a result of the above ruling, we find that the jury was not erroneously instructed as to the law and that the omission of a jury instruction relative to informed consent was not error. The jury charge adequately provided the correct principles of law as applied to the issue framed in the pleadings and the evidence, and the instructions adequately guided the jury in its deliberation. The trial court’s lack of instruction on hfiinformed consent did not mislead the jury to the extent that it was prevented from dispensing justice. We agree with the trial court finding that La. R.S. 40:1299.40 did not apply to the facts of this case and that lack of informed consent was not an issue. This assignment of error, therefore, is without merit.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court in favor of Defendants, Dr. Ronald Koepke and Louisiana Medical Mutual Insurance Company, and against Plaintiffs, William McDougald, Joey McDonald and Tracy McDonald. Costs of appeal are assessed to Plaintiffs, William McDougald, Joey McDonald and Tracy McDonald.
AFFIRMED.

. Defendants St. Francis North Hospital, Inc., and Dr. Mack Temple Douglas were dismissed from this lawsuit.

. Dr. Koepke is an invasive cardiologist (not an interventional cardiologist), a specialty in which a physician performs certain procedures and surgeries, such as the placement of pacemakers, but does not perform stent surgery.

. These are facts to which Nurse Gibson testified. Dr. Cox disputed this information and testified that he did not recall ever having this conversation with Nurse Gibson. There is no written confirmation in the patient’s records at either Dr. Koepke’s office or Dr. Cox’s office that this conversation between Nurse Gibson and Dr. Cox took place. Nurse Gibson testified that she believed there was a page missing from the patient’s file because it was common procedure in Dr. Koepke’s office to document telephone calls to other physicians when Dr. Koepke was asked to clear a patient for surgery. She also testified that requests for surgical clearance of Dr. Koepke's patients were made three to four times a day, and she described the office procedure for disposition of these requests. Calling other physicians to whom the patient may have complained of chest pain was part of the process each time a request for clearance for surgery was made.

. That statute was repealed and reenacted. The comment to the statute states: Part XXII, Uniform Consent Law of Chapter 5 of Title 40 of the Louisiana Revised Statutes, consisting of R.S. 40:1299.40, was amended and reenacted by Acts 2012, No. 759, § 2, eff. June 12, 2012 to consist of R.S. 40:1299.39.5 to 40:1299.39.7 under the same Part heading. The general subject matter of Part XXII remains unchanged.

. The parties and the trial court use both La. R.S. 40:1299.40 and La. R.S. 40:1299.39.5 interchangeably throughout the record because they are both the LUCL and relate to the issue of informed consent, although La. 40:1299.40 was in effect at the time this cause of action arose.